IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 2603 FERRARA DRIVE, NORTH CHARLESTON, SC 29405 | Case No. __2:23-cr-724__ |

**AFFIDAVIT IN SUPPORT OF WARRANT TO SEARCH AND SEIZE UNDER RULE 41**

Your Affiant, Hailey Barraco, being duly sworn, hereby deposes and states the following:

**A. INTRODUCTION**

1. I, Hailey Barraco, am a Special Agent (SA) with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have been employed by The Department of Homeland Security since April 2019. My primary responsibilities have included the investigation of criminal violations of the Controlled Substances Act, (Title 21, United States Code,) the Money Laundering Control Act (Title 18, United States Code), the Foreign Bank Secrecy Act (Title 31, United States Code), and related offenses.

2. Prior to my employment with HSI, I was employed as a Financial Crime Investigator with the Florida Department of Financial Services for four years. I have completed the Criminal Investigator Training Program and the HSI Special Agent Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia.

3. I am responsible for enforcing federal criminal statutes, including violations of Title 18 and Title 21 of the United States Code. I have received training and have actual experience relating to federal criminal procedures, federal statutes and U.S. Immigration and Customs regulations.

1

4. During my career as a Special Agent, I have participated in federal criminal investigations related to the importation and exportation of items contrary to law and controlled substance offenses. I have also participated in the service of federal search warrants in investigations relating to child exploitation and weapons violations. Through my training and experience, as well as through consultation with other law enforcement agents, I have become familiar with a variety of means through which individuals and entities import and export merchandise in violation of federal laws and the transportation, sale, and distribution of controlled substances. I am generally aware of the methods used in the transportation, sale, and distribution, and the financial transactions supporting those illegal activities.

5. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence located at 2603 FERRARA DRIVE, NORTH CHARLESTON, SC 29405 (hereinafter, referred to as the "TARGET RESIDENCE"), more fully described in Attachment A, for the things describe in Attachment B. There is probable cause to believe that evidence, fruits, and/or instrumentalities of violations of Title 21 U.S.C. §§ 841 and 846 will be located in the TARGET RESIDENCE.

6. The statements contained in this affidavit are based upon your Affiant's personal knowledge and/or on information provided by other law enforcement officers, agents, and personnel, as well as on your affiant's experience, background, and training. Because this affidavit is being submitted for the limited purpose of determining probable cause, your affiant has not included each and every fact known to her concerning this investigation. Your affiant has set forth only those facts believed to be necessary to establish probable cause.

7. I have received specialized training at the Federal Law Enforcement Training Facility, located in Glynco, Georgia, regarding the identification of controlled substances and the

operation of drug trafficking organizations. Your Affiant has participated on search warrants and has executed search warrants which have resulted in the seizure of illegal drugs and evidence of drug violations.

### B. AFFIANT'S KNOWLEDGE

8. Based upon my training and experience and discussions with other agents and law enforcement officers concerning the distribution of controlled substances, I am aware of the following:

a. That drug trafficking on a scale as described herein is an economic crime based on the profits to be earned. Large-scale narcotics traffickers often maintain, on hand, large amounts of U.S currency to maintain and finance their ongoing drug business.

b. That persons engaged in drug trafficking commonly conceal controlled substances, currency, financial instruments, precious metals, jewelry, titles to automobiles, and other items of value in their residences, businesses, and automobiles.

c. That when drug traffickers amass large proceeds from the sale of drugs, the traffickers attempt to legitimize these profits thorough various money laundering techniques such as the placing of assets in nominee names, use of legitimate and sham/shell businesses, use of financial institutions, use of wire transmitters, and numerous other techniques. That to accomplish these goals they often utilize domestic and foreign banks and/or financial institutions and their attendant services, securities, safe deposit boxes, cashier's checks, drafts, letters of credit, brokerage houses, real estate, "shell" corporations and businesses as "fronts" for their proceeds.

d. That narcotics traffickers purchase assets with the proceeds of their unlawful activity and often place these assets in nominee names. Oftentimes, drug dealers place these assets in names of relatives, close acquaintances, or business entities to avoid detection of these assets by

government agencies.

e. That drug traffickers commonly "front" (provide on consignment) drugs to their customers or clients and frequently maintain records of same.

f. That safes and other concealed compartments are often utilized as locations to store drugs, currency, assets, and other proceeds and evidence of drug trafficking.

g. That after purchasing controlled substances, traffickers will often transport or have transported these controlled substances to areas where they will distribute the controlled substances. That methods of transportation include but are not limited to commercial airlines, private aircraft, boats and ocean-going vessels, rental and private automobiles, and government and contract mail carriers.

h. That it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them. Additionally, it is common that all or part of these records are in code and kept at different locations to avoid detection by law enforcement.

i. That drug traffickers often take, or cause to be taken, photographs or videos of themselves, their associates, their property and assets, and their product. That these photos and videos are usually maintained in their residences.

j. That drug traffickers often keep readily available the paraphernalia for packaging, cutting, weighing, and distribution of controlled substances. That these items include, but are not limited to, scales, plastic bags, and heat sealers.

k.  That drug traffickers commonly use electronic equipment to aid them in their drug trafficking activities. This equipment includes, but is not limited to, digital display pagers (beepers), cellular telephones, computers, speed dialers, electronic telephone and date books, money counters, fax machines, and police scanners.

l.  That people who traffic in controlled substances frequently maintain firearms or other weapons to protect themselves, the controlled substances, and the proceeds of the sale of controlled substances on their persons, at their residences, in their automobiles, and/or at their businesses.

m.  That the courts have recognized that unexplained wealth is probative evidence of trafficking in controlled substances.

n.  That drug traffickers commonly have in their possession, that is, on their person, at their residences, in their automobiles, and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.  Said firearms are used to protect and secure a drug trafficker's property.  Such property may include, but is not limited to narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. currency.

## C.  PROBABLE CAUSE

9. On June 20th and 22nd, 2023, Homeland Security Investigations and the Louisville Metro Police conducted a targeted enforcement operation at the United Parcel Service (UPS) hub located in Louisville, KY.  A canine with Customs and Border Protection (CBP) was utilized during this operation.  The canine had a positive alert for a package addressed to "Leeroy Johnson" at 2603 Ferrara Drive, North Charleston, SC 29405, the TARGET RESIDENCE. The shipment was inspected after obtaining a state search warrant and found to contain approximately 1 kilogram of a white substance.  The substance was field tested positive for

cocaine utilizing a TruNarc, a portable machine used for drug analysis. The package also contained marijuana and mushrooms. The shipper information on the package was "Lamar Sextion" with a phone number of (843) 926-4574. The package was shipped from UPS store 4872 located at 2202 South Figueroa Street, Los Angeles, CA 80007 on June 19, 2023.

10. According to the South Carolina Department of Motor Vehicles (SCDMV) and law enforcement databases, Omar Rashad SEXTON SR (DOB: 07/08/1980) resides at the TARGET RESIDENCE—the same address to which the package containing narcotics was addressed.

11. A review of Omar SEXTON'S criminal history reveals he was arrested for being in possession of a firearm by a convicted violent felon and manufacturing and distribution of cocaine in 2018 by the South Carolina Law Enforcement Division (SLED). SEXTON was subsequently convicted for the narcotics violations in 2023. SEXTON has additional narcotics convictions involving cocaine in 2001, 2002, 2004, and 2015.

12. Records from AT&T indicate the phone number associated with the seized package, (843) 926-4574, has a subscriber of Omar SEXTON and activation date of October 28, 2014. The phone number shows it is still active and has a billing address of 107 Van Buren Avenue, Ladson, SC 29456.

13. Phone records for (843) 926-4574 indicate SEXTON has been communicating with two individuals in California. SEXTON communicated with one of the individuals approximately 94 times in a four-day period prior to and immediately following the package being shipped from the UPS store. Law enforcement databases identified a possible owner of the device with which SEXTON communicated as an individual whose criminal history revealed controlled substance convictions in 2000, 2006, 2007, 2009, 2014, and 2018. The other contact is identified as a convicted felon who resides approximately 14 minutes from the UPS store.

14. According to records obtained from Jet Blue Airlines, Omar SEXTON has traveled to and from Charleston and Los Angeles several times in the last few months. Records indicate SEXTON utilized Jet Blue Airlines for a round trip to Los Angeles in April 2023, two one-way trips in May 2023, and two one-way trips and a round trip in June 2023. According to Jet Blue records, SEXTON flew from Los Angeles Airport (LAX) to Charleston International Airport (CHS) on June 19, 2023. Records show the flight left LAX at 9:10pm and arrived in Charleston at 5:01am the morning of June 20th.

15. Video surveillance from UPS shows SEXTON arrive with a box at the UPS store located at 2202 South Figueroa Street, Los Angeles, CA 80007 on June 19, 2023. Video shows SEXTON utilized cash to pay for the shipment. According to store records and conversation with a store employee, the facility closes at 7:00 P.M. on Mondays.

16. During surveillance conducted on June 28, 2023 at the TARGET RESIDENCE, agents observed a silver Toyota Camry with South Carolina tag UZM458 and a backed in silver Dodge Ram. According to SCDMV, the Toyota Camry is registered to SEXTON. SCDMV also shows SEXTON has a valid registration for a Dodge Ram.

17. On July 17, 2023, United States Magistrate Judge Molly H. Cherry issued a tracking warrant for SEXTON's phone, which expired August 16, 2023.

18. On July 23, 2023, SEXTON posted on his social media "Y'all know I got my own strain of weed coming out in California August 8, right?"

19. On July 24, 2023, Omar SEXTON traveled to the Charleston airport and flew to San Francisco, California. Based on the GPS location of the phone, agents were able to determine Omar SEXTON arrived in San Francisco, CA. The GPS location showed SEXTON

then traveled north to the Myers Flat, CA area. During the time he was in/around Myers Flat, CA GPS pings showed the phone in the middle of a wooded area.

20. On July 26, 2023, SEXTON flew back to Charleston from San Francisco. Agents were able to follow the GPS location of the phone and show his travel from California back to the TARGET RESIDENCE in Charleston, SC.

21. On August 10, 2023, GPS pings for the phone associated with SEXTON showed him in the radius of the TARGET RESIDENCE at approximately 1250 hours. The next ping, at approximately 1305 hours showed a GPS location on Interstate 26 West. GPS pings show the GPS location continuing west up Interstate 26 and north on Interstate 385 to the Greenville, SC area. According to the pings, SEXTON was there less than an hour before returning to Charleston, SC. Upon arriving back to the Charleston area, SEXTON was observed getting off Interstate 26 on Dorchester Road and turning onto Stark Lane then Ferrara Drive. SEXTON was observed bypassing the TARGET RESIDENCE and turning left onto Madden Drive before pulling into 2642 Madden Drive. Several individuals were observed walking up to SEXTON and his vehicle. SEXTON exited his vehicle and popped the hood. Agents observed two vehicles leave in tandem from 2642 Madden Drive. SEXTON then drove to the TARGET RESIDENCE. Agents observed a white Ford Escape pull into the driveway of the TARGET RESIDENCE. Once the Ford Escape left the residence, it turned right onto Madden Drive. The Ford Escape failed to stop at the stop sign on the corner of Madden Drive and Dorchester Road which was observed by a North Charleston Police officer. The Ford Escape was stopped, and the driver was found to be in possession of 124.4 grams of marijuana.

22. SEXTON had been driving a red Dodge Charger for several weeks which was a rental vehicle from Avis. It was unknown that SEXTON had traded that vehicle in for another

vehicle, a white Toyota Rav4, on August 9 or August 10. The phone's GPS location was utilized to identify SEXTON'S location until agents were able to obtain confirmation from Avis SEXTON was now driving the Rav4.

23. On August 17, 2023, United States Magistrate Judge Mary Gordon Baker issued a tracking warrant for SEXTON's phone, which expires September 16, 2023.

24. On August 23, 2023, agents utilized the GPS locations to confirm that SEXTON traveled to the Charleston Airport. Based on the GPS pings, agents were able to determine that SEXTON flew to Los Angeles, CA. As of the submission of this warrant, SEXTON has not yet returned from Los Angeles, CA.

**CONCLUSION**

25. I submit that this affidavit supports probable cause for a warrant to search the TARGET PREMISES, described in Attachment A, and seize the items described in Attachment B.

26. This affidavit has been reviewed by Assistant United States Attorney Lee Holmes.

HAILEY E BARRACO
Digitally signed by HAILEY E BARRACO
Date: 2023.08.28 08:44:49 -04'00'

Hailey Barraco, Special Agent
Homeland Security Investigations

SWORN TO ME VIA TELEPHONE OR
OTHER RELIABLE ELECTRONIC MEANS
AND SIGNED BY ME PURSUANT TO
FED. R. CRIM. P. 4.1 AND 4(d) OR 41(d)(3),
AS APPLICABLE

This 28th day of August, 2023
Charleston, South Carolina

*[signature: Mary Gordon Baker]*

The ~~Honorable~~ Mary Gordon Baker
UNITED STATES MAGISTRATE JUDGE